UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 18-12094-RGS

ERIC WICKBERG, on behalf of himself
and all others similarly situated

v.

LYFT, INC.

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO COMPEL ARBITRATION

December 19, 2018

STEARNS, D.J.

Eric Wickberg is the plaintiff in this putative class action brought against Lyft, Inc. The Complaint alleges that Lyft misclassified him and other potential class members as independent contractors, rather than employees, and avoided paying them the minimum wage and overtime. Lyft now moves to stay the action and compel arbitration or, in the alternative, to strike the class allegations. For the reasons to be explained, Lyft's motion to compel arbitration will be allowed.

## BACKGROUND

Lyft is a ridesharing platform that uses a smartphone application to connect riders with available drivers for a fee. Wickberg is a Massachusetts

resident who has driven for Lyft since September of 2017. When he enrolled online as a driver with Lyft on January 28, 2017, Wickberg clicked a checkbox that stated, "I agree to Lyft's [September 30, 2016] terms of services." Lauzier Decl. (Dkt # 16) ¶¶ 10-12.[1] As shown in the image below, the words "Lyft's terms of services" were highlighted in pink and hyperlinked to the written terms. *Id.* ¶ 12.

*Id.* ¶ 11.

---

[1] The court may consider the materials relating to "Lyft's arbitration clause," Compl. ¶ 4, because they are referenced in and are central to the Complaint. *See Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir. 2007) (noting that a court "may consider 'documents the authenticity of which are not disputed by the parties,'" as well as "'documents central to the plaintiff['s] claim,'" and "'documents sufficiently referred to in the complaint'"), quoting *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).

Among other provisions, the terms provided in capital letters that drivers must "SUBMIT CLAIMS . . . AGAINST LYFT TO BINDING AND FINAL ARBITRATION ON AN INDIVIDUAL BASIS, NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY CLASS, GROUP OR REPRESENTATIVE ACTION OR PROCEEDING." *Id.* ¶ 16. On May 3, 2018, Wickberg reaffirmed acceptance of a nearly identical arbitration provision posted by Lyft on February 6, 2018. However, on May 20, 2018, Wickberg wrote to Lyft's General Counsel stating that he "would like to opt out of arbitration with respect to claims that are not part of a pending settlement action." Lieu Decl. (Dkt # 18), Ex. C.

## DISCUSSION

A party seeking to compel arbitration pursuant to the Federal Arbitration Act (FAA) must show "'(1) that a valid agreement to arbitrate exists, (2) that the movant is entitled to invoke the arbitration clause, (3) that the other party is bound by that clause, and (4) that the claim asserted comes within the clause's scope.'" *Ouadani v. TF Final Mile LLC*, 876 F.3d 31, 36 (1st Cir. 2017), quoting *InterGen N.V. v. Grina*, 344 F.3d 134, 142 (1st Cir. 2003). "'[E]xcept where the parties clearly and unmistakably provide otherwise, it is the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances concerning a particular

3

matter.'" *Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 375 (1st Cir. 2011), quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 301 (2010) (citations omitted in *Dialysis*). "'When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.'" *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 61 (1st Cir. 2018), quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Under Massachusetts law, courts "have held that . . . clauses [in online contracts] will be enforced provided they have been reasonably communicated and accepted and if, considering all the circumstances, it is reasonable to enforce the provision at issue." *Ajemian v. Yahoo!, Inc.*, 83 Mass. App. Ct. 565, 573 (2013), *aff'd*, 478 Mass. 169 (2017).

### *Reasonable Notice*

Wickberg argues that the agreement to arbitrate is invalid because the September 30, 2016 terms were not reasonably communicated for several reasons. First, the terms appear "three-quarters of the way down" on a screen that offers "no contextual clue" that the driver is entering into a binding contract with Lyft. Opp'n (Dkt # 19) at 6. Second, the placement of the terms could be read to suggest that they referred to the driver's personal information or the use of the promo or referral codes. Third, the terms were

4

"buried amidst a multi-screen sign-up process." *Id.* at 8. Fourth, the terms are "the smallest font on the page and . . . visually dwarfed by other more prominent text." *Id.* at 9. And finally, the hyperlinked text "is not italicized, bolded, underlined, or in classic blue coloring to indicate that it is a hyperlink." *Id.* As a result, most drivers, according to Wickberg, "would not think they were agreeing to a binding employment contract; they would not realize that they could click on the hyperlink to view the contract's terms, nor would they have reason to know that there was an arbitration provision in Lyft's contract." *Id.* at 10.

Wickberg primarily relies on *Cullinane v. Uber Techs., Inc.*[2] In *Cullinane*, the First Circuit, applying Massachusetts law, invalidated an Uber arbitration agreement because it did not reasonably notify Uber's riders of

---

[2] Wickberg also notes that two other courts have held that Lyft's agreement was not reasonably communicated, even though the plaintiffs in those cases had affirmatively checked their acceptance of the hyperlinked terms. In *Applebaum v. Lyft, Inc.*, a court in the Southern District of New York invalidated an online Lyft agreement because "the text is difficult to read: 'I agree to Lyft's Terms of Service' is in the smallest font on the screen, dwarfed by the jumbo-sized pink 'Next' bar at the bottom of the screen and the bold header 'Add Phone Number' at the top." 263 F. Supp. 3d 454, 466 (S.D.N.Y. 2017) (emphasis omitted). Similarly, in *Talbot v. Lyft, Inc.*, a California state court invalidated a Lyft agreement identical to the one at issue here because "nothing supports the conclusion that (i) the pink words 'Terms of service' were a hyperlink or that (ii) they linked to the contract that governed the working relationship between Lyft and drivers." No. 18-566392, at 8 (Cal. Sup. Ct. Oct. 19, 2018). I find these cases unpersuasive, as they apply New York and California law, and not the law of Massachusetts.

its terms. 893 F.3d at 64. The Court determined that the layout and design of Uber's registration screen rendered the hyperlinked "Terms of Service & Privacy Policy" insufficiently conspicuous. *Id.* at 63-64 ("Even though the hyperlink did possess some of the characteristics that make a term conspicuous, the presence of other terms on the same screen with a similar or larger size, typeface, and with more noticeable attributes diminished the hyperlink's capability to grab the user's attention.").

However, as Lyft points out, Uber's agreement in *Cullinane* is notably different from Lyft's. The First Circuit explained in *Cullinane* that:

> Uber chose not to use a common method of conspicuously informing users of the existence and location of terms and conditions: requiring users to click a box stating that they agree to a set of terms, often provided by hyperlink, before continuing to the next screen. Instead, Uber chose to rely on simply displaying a notice of deemed acquiescence and a link to the terms.

*Id.* at 62. By contrast, Lyft's display of the arbitration agreement conforms to what the First Circuit held would be a conspicuous and enforceable agreement. These online agreements – where a user selects "I agree" without necessarily reviewing the contract – are typically called "clickwrap" agreements, and are generally held enforceable.[3] *See Bekele v. Lyft, Inc.*, 199

---

[3] There are four general categories of online contracts:

> Browsewrap exists where the online host dictates that assent is given merely by using the site. Clickwrap refers to the assent

6

F. Supp. 3d 284, 295-296 (D. Mass. 2016) ("Massachusetts courts have routinely concluded that clickwrap agreements – whether they contain arbitration provisions or other contractual terms – provide users with reasonable communication of an agreement's terms."); *Ajemian,* 83 Mass. App. Ct. at 576 ("[F]orum selection clauses have almost uniformly been enforced in clickwrap agreements."); *Small Justice LLC v. Xcentric Ventures LLC*, 99 F. Supp. 3d 190, 196 (D. Mass. 2015), *aff'd*, 873 F.3d 313 (1st Cir. 2017) ("Clickwrap agreements are generally upheld because they require affirmative action on the part of the user.").[4] Unlike Uber's screen, Lyft's screen required Wickberg to click a box stating that he "agree[d] to Lyft's

---

> process by which a user must click "I agree," but not necessarily view the contract to which she is assenting. Scrollwrap requires users to physically scroll through an internet agreement and click on a separate "I agree" button in order to assent to the terms and conditions of the host website. Sign-in-wrap couples assent to the terms of a website with signing up for use of the site's services . . . .

*Cullinane*, 893 F.3d at 61 n.10, quoting *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 394-395 (E.D.N.Y. 2015). But "the existence of an arbitration agreement is not affected by how [I] categorize the online contract at issue here." *Id.*

[4] Lyft argues that a District of Massachusetts court, in *Bekele*, "enforced an arbitration agreement with nearly identical terms." Mem. (Dkt # 15) at 1. *Bekele* is somewhat inapposite because it involved a "scrollwrap" agreement, where a user must scroll through an entire agreement before assenting to it, not a clickwrap agreement like the one at issue here. 199 F. Supp. 3d at 289. It is true, however, that the arbitration agreements themselves here and in *Bekele* parallel one another.

terms of services" before he could continue with the registration process. And although, as Wickberg asserts, "Lyft's terms of service" appeared towards the bottom in a smaller font and without a typical blue-colored hyperlink, the phrase was pink and distinguishable on the screen. *See Cullinane*, 893 F.3d at 62 ("Several nonexhaustive examples of general characteristics that make a term conspicuous include using larger and contrasting font, the use of headings in capitals, or somehow setting off the term from the surrounding text by the use of symbols or other marks.").[5]

***Acceptance***

Wickberg further argues that there is no valid agreement to arbitrate because he "did not unambiguously manifest assent" to the September 30, 2016 terms. Opp'n (Dkt # 19) at 6 n.5 (emphasis omitted). But as discussed above, Wickberg affirmatively adopted those terms by clicking "I agree." He further agreed "TO WAIVE [HIS] RESPECTIVE RIGHTS TO RESOLUTION

---

[5] Wickberg also challenges the arbitration agreement on grounds that he does not remember, nor is there is any evidence of him, clicking the hyperlink to view the terms of service. However, the relevant inquiry is not whether he actually viewed the terms but whether they were reasonably communicated to him. *See Cullinane*, 893 F.3d at 62 ("[W]hen the terms of the agreement are only available by following a link, the court must examine 'the language that was used to notify users that the terms of their arrangement with [the service provider] could be found by following the link, how prominently displayed the link was, and any other information that would bear on the reasonableness of communicating [the terms].'"), quoting *Ajemian*, 83 Mass. App. Ct. at 575.

OF DISPUTES IN A COURT OF LAW BY A JUDGE OR JURY" and to resolve "ALL DISPUTES AND CLAIMS . . . BY BINDING ARBITRATION SOLELY BETWEEN [HIM] AND LYFT." Lauzier Decl. (Dkt # 16) ¶ 16.

In short, Wickberg entered into a valid arbitration agreement with Lyft by affirmatively assenting to reasonably communicated terms. *See Ajemian*, 83 Mass. App. Ct. at 576 ("Although forum selection clauses contained in online contracts have been enforced, courts have done so only where the record established that the terms of the agreement were displayed, at least in part, on the user's computer screen and the user was required to signify his or her assent by 'clicking' 'I accept.'"). Wickberg's allegations of misclassification and wage violations clearly fall within the terms of the arbitration agreement, which covers "all disputes and claims" between him and Lyft. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) ("The [FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ."). It is, therefore, "reasonable to enforce" the arbitration agreement. *Ajemian*, 83 Mass. App. Ct. at 573.

**Opt-Out**

Wickberg also maintains that he opted out of the arbitration agreement because of his May 20, 2018 letter to Lyft's General Counsel, which stated

9

that he "would like to opt out of arbitration with respect to claims that are not part of a pending settlement action." Lieu Decl. (Dkt # 18), Ex. C. However, Wickberg did not effectively opt out of the September 30, 2016 terms because he did not so notify Lyft in writing within the required 30 days of his acceptance of that agreement. *Id.* ¶ 4. Instead, with his letter, he opted only out of the February 6, 2018 terms, which provided in relevant part:

> As a Driver or Driver applicant, you may opt out of the requirement to arbitrate Driver Claims . . . pursuant to the terms of this subsection if you have not previously agreed to an arbitration provision in Lyft's Terms of Service where you had the opportunity to opt out of the requirement to arbitrate. *If you have previously agreed to such an arbitration provision, you may opt out of any revisions to your prior arbitration agreement made by this provision in the manner specified below, but opting out of this arbitration provision has no effect on any previous, other, or future arbitration agreements* that you may have with Lyft.

*Id.* ¶ 5 (emphasis added). In other words, his opt-out was effective only as to revisions to the September 30, 2016 arbitration provision, which are immaterial here.[6] Wickberg takes issue with this reading because it means, in his view, that Lyft "could constantly send drivers a barrage of new

---

[6] Lyft also argues that Wickberg's filing of an arbitration demand against Lyft at the American Arbitration Association, on May 31, 2018, "demonstrates that he and his attorney understood that he remained bound to individual arbitration." Mem. (Dkt # 15) at 15. Wickberg asserts that he mistakenly filed that demand. Opp'n (Dkt # 19) at 12-13. The court need not reach this issue.

agreements and they would be deemed to have accepted arbitration if they fail to opt out even once, despite their unequivocal indication that they *do not want to have to arbitrate any disputes with the company*." Opp'n (Dkt # 19) at 4 n.2 (emphasis in original). But since Wickberg does not provide a legal basis to challenge that reading, he remains bound by the September 30, 2016 arbitration agreement.[7] *See Suffolk Const. Co. v. Lanco Scaffolding Co.*, 47 Mass. App. Ct. 726, 729 (1999) ("[T]he court must construe all words that are plain and free from ambiguity according to their usual and ordinary sense."); *Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 533 (2012) ("[The FAA] 'reflects an emphatic federal policy in favor of arbitral dispute resolution.'") (citation omitted).

## ORDER

For the foregoing reasons, Lyft's motion to compel arbitration is ALLOWED. The Clerk will stay the case pending arbitration.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

[7] Having so concluded, the court need not address Lyft's alternate motion to strike the class allegations.